1

2

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

4

5

6

7

8

9

FLYING EAGLE ESPRESSO, INC.,

Plaintiff(s),

v.

HOST INTERNATIONAL INC., et al.,

Defendant(s).

NO. C04-1551P

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

10

11

12

13

The above-entitled Court, having received and reviewed the motions of all three Defendants for summary judgment in this matter, all the pleadings filed in response to said motions, and all exhibits and declarations attached thereto, and having heard oral argument thereon, makes the following ruling:

14

15

IT IS HEREBY ORDERED that summary judgment will be GRANTED to all Defendants on the following causes of action:

16

    1.      Violations of the Washington anti-trust statutes (RCW 19.86.030, 19.86.040)

17

    2.      Violations of the Washington Consumer Protection Act (RCW 19.86.020)

18

19

IT IS FURTHER ORDERED that summary judgment will be DENIED on the following causes of action:

20

    1.      Civil conspiracy under Washington state law (as to all Defendants)

21

    2.      Violations of 42 U.S.C. § 1983 (as to all Defendants)

22

    3.      Violations of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4) and (e) (as to

23

                Defendant Hotel Employees and Restaurant Employees Union Local No. 8 only)

24

25

26

**ORD ON MTNS
FOR SUMM JMT - 1**

4. Allegations of tortious interference with a business expectancy (as to Defendants the Port of Seattle and Hotel Employees and Restaurant Employees Union Local No. 8 only).

IT IS FURTHER ORDERED that summary judgment as to the cause of action against Defendant the Port of Seattle for contempt of court will be DENIED; however, Plaintiff is ordered to move the Court for an order of referral of the civil contempt cause of action to the Honorable Barbara J. Rothstein of this district for a determination of whether she wishes to retain jurisdiction over such claim.

**Background**

By virtue of a long-term lease and concession agreement with the Defendant Port of Seattle ("the Port"), Defendant Host International ("Host") had the right to sublease concession space within the Seatac Airport. The Port was obligated by law to make a certain percentage of concession space available for "disadvantaged business enterprises" ("DBEs") and in 1994 Plaintiff Flying Eagle Espresso ("FEE") won out over several hundred other DBE applicants to open a retail coffee kiosk in the baggage claim area of the airport. Like the rest of the DBEs at the time, FEE employed non-union labor (although the business offered no benefit plan, FEE paid a higher per-hour wage than the union rate). Elmer Decl., ¶ 9.

Host's lease was set to expire at the end of 2004. The collective bargaining agreement ("CBA") that Defendant Hotel Employees and Restaurant Employees Union Local No. 8 ("HERE") was negotiating with Host prior to the expiration of Host's lease with the Port contained a provision (Article 2.01) with language aimed at non-union shops within the facility:

> No work customarily performed by employees covered by this Agreement shall       be performed under any sublease, subcontract, or other agreement unless the       terms of any lease, contract or other agreement specifically state that (a) all such   work shall be performed only by members of the bargaining unit covered by       this Agreement and (b) the Employer shall at all times hold and exercise full       control of the terms and

1          conditions of employment of all such employees          pursuant to the terms of this
2          Agreement.  CBA, Article 2.01[1]

3  The CBA was approved and executed in November 2002.

4          On October 31, 2002, the Port and HERE entered into a Memorandum of Understanding (the

5  "MOU") describing a 3-tier concession structure which included an Exhibit A entitled "Position on

6  Labor Harmony for Concessions."  That exhibit's "General Statement" declared:

7          The Port of Seattle values and requires Labor Harmony among all of the
           vendors operating at the  Airport.  To this end, it will be the responsibility         of
8          concessionaires to furnish labor that can work in harmony with all other          labor
           employed at the Airport and to propose and implement a Labor          Harmony
9          plan.  This requirement is a material element of the concessionaire          lease
           agreements (the "Contracts").   Failure by a concessionaire or any of its sublessees to
10         comply with this requirement will be deemed a breach of the          contract, which will
           subject the Concessionaire to termination of the Contract          with the Port.[2]

11  In June 2003, the Port and Host entered into a new lease (which also contained reference to "labor

12  harmony" and required Port approval of any sublease).

13         The Port had previously run into difficulty for requiring a third-party tenant to use union labor.

14  An injunction issued by Judge Barbara J. Rothstein of this district in <u>CityIce v. Port of Seattle</u> (C99-

15  1647BJR, Dkt. No. 29) prohibited the Port from engaging in "any conduct that interferes, either by the

16  Port's actions or inactions, with the exercise of the federally protected rights of. . . third parties using

17  Port facilities to assign work to their own employees. . ."  It is this order that is the basis of Plaintiff's

18  assertion that the Port is liable for civil contempt of court.

19         Shortly after these agreements were in place, Plaintiff's owner Jean Elmer ("Elmer") was

20  informed on at least two occasions by Linda LaCombe ("LaCombe"), the Port's retail manager at the

21  _____

22  [1] Plaintiff makes much of the fact that, in the discussions leading up to the approval of the CBA, HERE

23  notated a draft of the document with the language "Proposal to Apply to Current DBE's" appended to this
    section.  Pltf Exh. 25, p. UNION 000241.  The union makes much of the fact that the proposed language
    was          ultimately withdrawn and does not appear in the final language.

24  [2] The Port's and HERE's position is that this provision applied only to Tier II tenants (a category which
25  did   not include FEE).

26  **ORD ON MTNS
    FOR SUMM JMT - 3**

1   facility, that she would have to unionize in order to continue at SeaTac.  Elmer Decl. ¶ 9, Pltf. Exh.'s

2   59, 66.  Later testimony by LaCombe indicated that both her position (vis-a-vis the requirements for

3   renewal) and her communications to Elmer were reviewed and approved by her superiors.  Pltf. Exh.

4   70.

5        Elmer  polled her employees and was told that they did not wish to join a union.  Elmer Decl. ¶

6   8.  Throughout much of 2003, Elmer received communications, oral and written, from officials for the

7   Port and Host to the effect that she would be required to join the union and that she would have to

8   submit a Labor Harmony Plan (approved by the union) before her sublease would be renewed.

9   Internal communications between representatives of the Defendants indicate that the Port and Host

10   had discussed the issue and agreed that "all facilities covered by the HMS Host contract must be

11   covered by collective bargaining."  Pltf. Exh. 73.

12        On August 27, 2003, Host employee Robert van Snik sent Elmer a Letter of Intent ("LOI")

13   offering to renew her sublease conditioned on the Port's approval of the sublease and FEE's

14   submission of a Labor Harmony Plan.  She was encouraged to "meet with representatives of HERE

15   Local 8 to. . . assist you in developing your plan."  Van Snik's letter stated that FEE's Labor Harmony

16   Plan ("LHP") "is to contain a statement as to whether HERE Local 8 is in agreement with your plan."

17   Pltf. Exh. 42.  Within ten days, Plaintiff responded with inquiries about the LHP and whether it meant

18   she had to unionize.  Pltf. Exh. 43.  Twenty-five days later, Mr. Van Snik of Host responded, but his

19   response included no information about the LHP or the unionization requirement. Instead, Elmer was

20   advised that FEE would have to relocate if they wished to renew their airport lease. Pltf. Exh. 44.

21   Defendants do not controvert Plaintiff's allegation that the nature and substance of the LHP were

22   never explained to her.  Elmer Decl. ¶ 15.

23        In the wake of these exchanges, Elmer alleges that she tried to meet with union officials to

24   discuss the LHP requirement.  Elmer Decl. ¶ 13, Pltf Exh's 49, 52, 55.  She was unsuccessful in this

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 4**

attempt until November 13, 2003, when she met with Rick Sawyer of HERE ("Sawyer").  She alleges (and HERE does not deny) that Sawyer said he knew nothing about Host's LHP requirement and had no intention of getting involved in negotiations between FEE and Host on the issue.[3]  Elmer Decl. ¶ 13.   Accepting his representations, Elmer concluded that there was no requirement that FEE become unionized to continue on at SeaTac and left a voicemail to that effect with Port officials.  Pltf Exh. 93.

FEE submitted a Letter of Intent on November 7, 2003.  Pltf. Exh. 55.  However, having had no success obtaining a meeting with a union representative to that point, the LOI did not contain the LHP Host had indicated was required.  Following submission of the November 2003 LOI, FEE made attempts to submit a draft of a LHP to Host (Pltf Exh's 85, 86).  On December 19, 2003, van Snik sent a letter to Elmer terminating their negotiations and indicating Host's intent to seek another candidate to fulfill their DBE requirement.  Pltf Exh. 87.  The termination was confirmed in a letter to FEE's attorneys several days later.  Pltf Exh. 88.

Plaintiff did eventually send a finalized version of their LHP (unapproved by HERE and indicating FEE's intent to remain non-union) to Host in January of the following year, but negotiations had completely broken down by that point.  Plaintiff alleges that every other DBE in the airport submitted a LHP which indicated (usually in a single paragraph) their intent to adopt the CBA (Pltf Exh's 95 - 101), and that every one of those requests for renewal was granted.

**Summary Judgment Standard**

Summary judgment is not warranted if a material issue of fact exists for trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying facts are viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the

---

[3] Sawyer testified that he was unaware of the LHP provision and believed the union had no role in approving sublessees' labor harmony plans.  Noble Decl. F, Sawyer Dep., pp. 128-132.

1  evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v.</u>

2  <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The party moving for summary judgment has the

3  burden to show initially the absence of a genuine issue concerning any material fact. <u>Adickes v. S.H.</u>

4  <u>Kress & Co.</u>, 398 U.S. 144, 159 (1970). This can be done by either producing evidence negating an

5  essential element of plaintiff's claim, or by showing that plaintiff does not have enough evidence of an

6  essential element to carry its ultimate burden at trial. <u>Nissan Fire & Marine Ins. Co. v. Fritz</u>

7  <u>Companies, Inc.</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).

8       Once the moving party has met its initial burden, the burden shifts to the nonmoving party to

9  establish the existence of an issue of fact regarding an element essential to that party's case, and on

10  which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24

11  (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must

12  have evidence showing that there is a genuine issue for trial. <u>Id.</u> at 324. Additionally, "at the

13  summary judgment stage the judge's function is not . . . to weigh the evidence . . . but to determine

14  whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 249.

15  **<u>Discussion</u>**

16       The first two causes of action (§§ 1 and 2 of the Sherman Act) in Plaintiff's Second Amended

17  Complaint have been previously dismissed upon motion of Defendants (Dkt. No. 31) and will not be

18  discussed further. This opinion will first address the causes of action upon which summary judgment

19  will be granted.

20       The Court GRANTS summary judgment on:

21  **<u>§§3 and 4 of the Washington Consumer Protection Act/Anti-Trust (Fourth and Fifth Causes of</u>**

22  **<u>Action)</u>**

23       The Court's dismissal of Plaintiff's Sherman Act federal anti-trust claims was premised on a

24  finding of "state actor" immunity for all defendants under the circumstances presented by this

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 6**

1    litigation.  *See* <u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 38, 44 (1985);  <u>Lorrie's Travel &</u>

2    <u>Tours, Inc. v. SFO Airporter, Inc.</u> 753 F.2d 790, 793 (9th Cir. 1985); <u>Snake River Valley Electric</u>

3    <u>Association v. Pacificorp.</u>, 357 F.3d 1042, 1047-48 (9th Cir. 2004). Defendants argue that "[s]tate

4    actor immunity bars Flying Eagle from asserting antitrust claims under state law to the same extent

5    that it bars such claims under the Sherman Act."  Port's 1st Motion, p. 13.

6           The argument is made that the Washington legislature intended that the Consumer Protection

7    Act ("CPA") be interpreted along the guidelines set up by the federal courts for corresponding federal

8    statutes (<u>State v. Black</u>, 100 Wn.2d 793, 799 (1984)); since §§ 3 and 4 of the CPA are the state

9    equivalent of the Sherman Act, Defendants claim the same protection afforded them under applicable

10   federal precedents.  However, the case law indicates that the state courts are to look to federal

11   precedent for "guidance," (<u>Id.</u>), not that federal precedent is controlling.

12              The directive to be "guided by" federal law does not mean that we are
                bound to follow it.  But neither are we free to ignore it, and indeed in
13              practice Washington courts have uniformly followed federal precedent
                in matters described under the Consumer Protection Act.
14              ***
                Any departure from federal law. . . must be for a reason rooted in our
15              own statutes or case law and not in the general policy arguments this
                court would weigh if the issue came before us as a matter of first
16              impression.

17   <u>Blewett v. Abbott Laboratories, et al.</u>, 86 Wash.App. 782, 787-88 (1997).

18          <u>Assurance Co. of America v. Wall & Assoc's, LLC of Olympia</u>, 379 F.3d 557 (9th Cir. 2004)

19   provides some further insight regarding how this Court should proceed regarding the application of

20   the state actor doctrine to Washington anti-trust law: "[W]hen interpreting state law, federal courts

21   are bound by decisions of the state's highest court.  In the absence of such a decision, a federal court

22   must predict how the highest state court would decide the issue. . ."  <u>Id.</u> at 609-10.   Therefore, we

23   look to Washington state law for guidance.

24

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 7**

1    The Washington CPA is patterned after federal law and the legislature anticipated that state

2    courts would be guided by federal court interpretation of federal antitrust law. RCW 19.86.920. See,

3    State v. Black, *supra*. This statute also commands that the regulatory scheme  "be liberally construed

4    that its beneficial purposes may be served." RCW 19.86.920.   However, as noted above, this

5    admonition does not mean that state courts are bound to follow federal law. *See* Blewett v. Abbott

6    Laboratories, *supra*.  As the Blewett court indicated, a departure from following the federal precedent

7    of the state actor immunity doctrine must have a firm foundation in state authority.

8    The closest Washington state corollary to the state actor immunity doctrine appears in the

9    exemption section of the CPA which governs state action or state regulated entities. The pertinent

10   language states that the CPA laws, including the anti-trust provisions, do not apply to "actions or

11   transactions permitted by any other regulatory body or officer acting under statutory authority of this

12   state." RCW 19.86.170.[4] This appears to be the Washington codification of the state actor doctrine.

13   In delineating the application of this exception, Washington courts have taken the approach

14   that "'[l]iberal construction' is a command that the coverage of an act's provisions in fact be liberally

15   construed and that its exceptions be narrowly confined." Vogt v. Seattle-First National Bank, 117

16   Wn.2d 541, 552, 817 P.2d 1365 (1991) (en banc). As a result, Washington courts have carefully

17   scrutinized both the "action or transaction" involved and the permission required to qualify for

18   exemption under in RCW 19.86.170.

19   In Dick v. Attorney General (83 Wn.2d 684 (1974)) the Court articulated a narrow

20   interpretation of "action or transaction" such that a generally regulated practice does not automatically

21   receive exemption from CPA claims. Id. at 688.  "If a particular practice found to be unfair or

22

23   [4] The statute states that the CPA does not apply to "actions and transactions otherwise permitted, prohibited        or regulated under laws administered by the insurance commissioner of this state, the Washington utilities and        transportation commission, the federal power commission." The narrower "actions or
24   transactions permitted"        language applies only to "any other regulating body or authority." RCW 19.86.170.

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 8**

deceptive is not regulated, even thought the business is regulated generally, it would appear to be the legislative intent that the provisions of the act should apply." Id. Although Dick analyzed an older version of the exemption section of the CPA, more recent cases likewise uphold the narrow interpretation of activity defined in the case. See Vogt, 117 Wn.2d at 551. Washington courts making an "exemption" analysis have closely analyzed the activity at issue for specific permission and narrowly construed that permission in order to avoid conflict with the "liberal construction" intent of the Washington legislature.  As a result, "permission" necessitates overt affirmative action to permit the activity by the entity involved in the complaint. Vogt, Id. at 552.  Washington takes a very limited approach to its application of the exemption for activities permitted by most agencies.

As the parties' briefing indicates, there are no Washington cases directly on point.  The reasoning and ruling of Robinson v. Avis Rent A Car Systems, Inc.  (106 Wn.App. 104 (2001)) provides the closest analogous example, all the more so considering that it involved the Port's relationship with car rental dealerships at the airport.. The Port charged rental car companies a concession fee for leasing space at the airport. The concession agreement originally prevented rental car companies from charging customers a separate fee to cover this expense. In order to recoup the expense, the car companies included the fee within the total charge quoted to the customer. When the Port decided not to enforce the provision preventing the charging of the separate fee, the rental companies began "unbundling" or separating the concession fee from the basic rental rate. Customers brought suit alleging that the additional concession fee was not quoted to them when making their reservations and the additional, separate charge was unfair or deceptive.

Several aspects of Robinson apply to the case at hand and suggest that Washington courts would not find state actor immunity applicable to Defendants' actions here.   First, both cases involve oversight activity by the Port.  Robinson identifies the Port as a "regulatory body" as defined by RCW

**ORD ON MTNS**
**FOR SUMM JMT - 9**

1    19.86.170. Since the Port occupies the same landlord authority over Host as over Avis, the Port

2    would qualify as a "regulatory body" within the meaning of the statute for this case.

3         The Robinson court also examined the powers granted to the Port as a regulating body for

4    evidence of specific statutory authority permitting the activities of the rental car agencies. The opinion

5    defined what must be demonstrated for specific permission: "[I]t is not enough to show that the Port...

6    'permitted' unbundling...[t]he car rental companies must also show that unbundling is within the

7    'statutory authority' of the Port to permit." Robinson, 106 Wn.App. at 822. The court found no

8    authority in the Port's enabling statutes to permit the complained-of activities of the defendant car

9    companies. RCW 14.08.120(6) gives the Port the authority to "determine the charges or rental for the

10   use of any properties under its control and the charges for any services or accommodations, and the

11   terms and conditions under which such properties may be used." Id. at 823 (citing RCW

12   14.08.120(6)). The Robinson court's reading of this statute concluded that "this statute neither

13   expressly nor impliedly grants to the Port the power to permit unbundling for purposes of exemption

14   under the CPA." Id. At 823.

15        This Court's order dismissing the Sherman Act claims focuses on two other sections of

16   14.08.120 permitting the Port

17            to confer the privileges of concession of supplying upon its airports goods,
             commodities, things, services and facilities...(RCW 14.08.120(4)) and ...to sell
18           or lease any property, real or personal, acquired for airport purposes and
             belonging to the municipality, which in the judgment of its governing body, may
19           not be required for aircraft landings, aircraft takeoffs, or related aeronautic
             purposes, in accordance with the laws of this state. RCW 14.08.120(5)
20

21   Dkt. No. 31, Order on Motion To Dismiss, pp. 4-5.

22        Similar to the provision allowing for rental car companies, this grant of authority allows the

23   Port to lease to concessionaires like Host.  However, it does not appear to give any authority for

24   regulating subtenants of those concessionaires by requiring things like LHPs. Given Washington's

25   narrow application of the exemption, the fact that the statute does not expressly or impliedly allow the

26   **ORD ON MTNS**
     **FOR SUMM JMT - 10**

1    Port to permit a lessee to require that subtenants have a LHP (regardless of what that document

2    consists of) is highly significant. Since the statute does not contain specific language discussing the

3    Port's regulation of subtenants of concessionaires, the "overt affirmative action to permit the activity

4    by the entity involved" required for exemption under RCW 19.86.170 is missing. Vogt, 117 Wn.2d at

5    552. This suggests that the Washington courts would not find state actor immunity for the Port or

6    the other defendants in this case.

7        As discussed in this Court's previous Order, the Ninth Circuit has been increasingly willing to

8    broaden the state actor exemption. (Order, *supra* at 4-5). The federal precedents indicated that the

9    structure of concession leasing at the airport was a reasonable consequence of the Port's authorizing

10   statute. Id. at 5. However, Washington courts require a specific grant of permission for the discrete

11   transaction or action involved. Concession leasing structure in general may be regulated under the

12   Port statutes, but this general regulation is not adequate for exemption under the CPA.

13       This case fits the situation described in Dick v. Attorney General, where "a particular practice

14   found to be unfair or deceptive is not regulated, even though the business is regulated generally." 83

15   Wn.2d at 684. Based on a finding that the Washington courts have spoken on the issue of state actor

16   immunity by announcing tests far stricter than the federal precedents applying state actor immunity,

17   this Court is not inclined to allow dismissal of the state antitrust claims based only on the prior

18   dismissal of the Sherman Act claims.

19       However, even with a finding that "state actor immunity" will not be extended to these

20   Defendants for the allegations of violating the Washington anti-trust statutes, Defendants are

21   nevertheless entitled to summary judgment on these causes of action. Plaintiff has the burden to

22   prove possession of monopoly power in a relevant market. High Technology Careers v. San Jose

23   Mercury News, 996 F.2d 987, 989-90 (9th Cir. 1993). What is fatal to FEE's anti-trust allegations is

24   its failure to offer proof of what the relevant market is (in terms of geography or product) over which

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 11**

1    they allege Defendants are exercising a monopoly.  They argue that the definition of the requisite

2    geographic market is a fact issue and contend (without citation to any evidence) that "SeaTac is a self-

3    contained geographic market" and that "the logical geographic market is the SeaTac site."  Plaintiff's

4    1st Response, p. 40.  The case law cited in support of their argument (International Boxing Club v.

5    United States, 358 U.S. 242 (1959)) is not helpful: the Supreme Court in International Boxing found a

6    "separate, identifiable market" based on "detailed findings" (Id. at 250-51) which are completely

7    absent from Plaintiff's pleadings.

8        At oral argument, Plaintiff argued that the "market" which they were claiming had been

9    monopolized by Defendants' activities was not the airport concessions market (generally) or coffee

10   retail service (specifically) but rather the "labor market" represented (presumably) by all the jobs

11   available within the airport.  Plaintiff's complaint makes no mention of the "labor market" as the

12   intended object of the anti-trust allegations.  Their reply brief does make mention of an attempt to

13   "monopolize the provision of labor in the concessions market at SeaTac" (Pltf's 1st Reply, p. 39), but

14   neither the Court nor Defendants read this to mean that Plaintiff's complaint was aimed at the

15   monopolization of a "labor market."  In any event, the deficiency in Plaintiff's proof is unaffected by

16   this contention – whether monopolization of coffee stands or labor markets is the object of the

17   complaint, Plaintiff has still failed to proffer the requisite proof of a "separate, identifiable market."

18       Plaintiff's anti-trust claims also suffer from a failure of proof of injury to competition.

19   Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed.Cir. 1999).  It is not enough to claim that

20   FEE's own operations were injured; "[t]he antitrust laws were enacted for the protection of

21   competition, not competitors," Id., quoting Brunswick Corp. v. Pueblo-Bowl-O-Mat, Inc., 429 U.S.

22   477, 488 (1977).  Plaintiff has provided no evidence, in the form of declarations, expert testimony or

23   statistics, that Defendants' alleged activities have injured competition.  The fact that the rest of the

24   DBEs signed renewed leases after submitting pro-union LHPs may be probative on the issue of

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 12**

mandatory unionization, but it falls short of proof of actual injury for anti-trust purposes (nor does

Plaintiff present any statutory authority that mandatory unionization is "injury *per se*").   Based on

these findings, summary judgment will be GRANTED on Plaintiff's state anti-trust law claims.

The Court also GRANTS summary judgment on:

## § 2 of the Washington Consumer Protection Act (Sixth Cause of Action)

> To prevail in a private Consumer Protection Act action, a plaintiff must     establish
> five distinct elements: (1) an unfair or deceptive act or practice;     (2)
> occurring in trade or commerce; (3) public interest impact; (4) injury          to
> plaintiff in his or her business or property; and (5) causation.

Hangman Ridge Training Stables, Inc. v. Safco Title Ins. Co., 105 Wn.2d 778, 780 (1986).   Plaintiff

must satisfy all five elements in order to prevail; in the summary judgment context, a plaintiff has the

burden to establish, at a minimum, the existence of disputed issues of material fact regarding each of

the elements of its cause of action.   Celotex, *supra* at 323-24.   Plaintiff's CPA cause of action in this

case is vulnerable to summary judgment because they have not established any facts supporting the

existence of a "public interest impact" as regards any of the defendants.

Despite Plaintiff's attempts to characterize its circumstances in a different light, the Court finds

that the facts in this case constitute a private contractual dispute.   "Ordinarily, a breach of a private

contract affecting no one but the parties to the contract is not an act or practice affecting the public

interest."  Id. at 790.   A complainant can refashion a private dispute into one with an impact on the

public by (1) a "per se" showing of the violation of a statute with a specific legislative declaration of

public interest (not alleged here) or (2) a showing that additional plaintiffs have been or will be

impacted in a similar manner.   The factors which need to be proven in this regard include:

> (1) Were the alleged acts committed in the course of defendant's business?
> (2) Did defendant advertise to the public in general?
> (3) Did defendant actively solicit this particular plaintiff, indicating potential
> solicitation of others?
> (4) Did plaintiff and defendant occupy unequal bargaining positions?

1   While no one factor is dispositive and it is not necessary that all of them be established, FEE is

2   required to establish sufficient "indicia of effect on public interest from which a trier of fact could

3   reasonably find public interest impact." Id. at 790-91.

4          Plaintiff's evidence regarding HERE and the Port is simply non-existent with respect to three

5   of the four factors.  Neither the union nor the municipal governmental body advertise to the public in

6   general, nor is there any proof that they solicited this particular plaintiff for anything.  Since FEE was

7   therefore not in a bargaining posture with either entity, there is no element of "unequal bargaining

8   positions."

9          The CPA claim as regards Defendant Host presents somewhat different issues.  Plaintiff

10  certainly makes the case that the alleged acts were committed in the course of Host's business as a

11  master concessionaire at the airport; that it was actively solicited by Host (as evidenced by the

12  presentation to FEE of the August 27, 2003 LOI, Pltf Exh. 42); and (viewing the evidence in the light

13  most favorable to Plaintiff) that the parties did not occupy equal bargaining positions (Host, as an

14  international corporation, being possessed of far greater resources to bring to the bargaining/

15  negotiating process than a single-stand coffee retailer like FEE).

16         But there is no evidence that Host advertised "to the public in general" and indeed no evidence

17  that they even solicited the replacement DBE who took over the sublease formerly held by Plaintiff.

18  FEE concedes that Defendants "may" not have advertised to the general public, but states conclusorily

19  that Host did solicit new tenants for SeaTac space.  While the Court may imagine that new applicants

20  for vacant subleases found out about their availability somehow, this is no substitute for the

21  requirement that a nonmovant in a summary judgment action produce evidence showing that there is a

22  genuine issue for trial.  Plaintiffs provide no proof of this solicitation, nor do they provide any case

23  authority for the larger issue of whether the solicitation of a few DBEs constitutes the kind of

24  "advertising to the public in general" which goes to the heart of the "public impact" issue.

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 14**

In the final analysis, Plaintiff has not borne its burden of establishing genuine disputes of material fact tending to establish that its private contract dispute with Defendant Host has any public interest or public impact whatsoever.  All Defendants are entitled to summary judgment dismissing the CPA § 2 claims against them.

The opinion now turns to those causes of action upon which summary judgment will not be granted.

Summary judgment will be DENIED on:

**Civil Conspiracy under State Law (Seventh Cause of Action)**

The establishment of a civil conspiracy among these defendants requires Plaintiff to demonstrate two elements: (1) that two or more parties combined to accomplish an unlawful purpose or combined to accomplish a lawful purpose by unlawful means, and (2) the conspirators entered into an agreement to accomplish the conspiracy.  <u>Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc.</u>, 114 Wn.App. 151, 160 (2002).

None of the defendants disputes that requiring FEE to unionize as a condition of the renewal of their lease at SeaTac is legally impermissible.  If Plaintiff succeeds in establishing the existence of genuine disputes of material fact concerning each of the two prongs of the civil conspiracy proof as regards each of these Defendants, they are entitled to a denial of summary judgment on this cause of action.  The Court finds that Plaintiff has carried this burden.

Plaintiff's proof regarding these two prongs falls into two general categories: first, the documented agreements between Defendants – the MOU (between the Port and HERE) and the CBA (between Host and HERE); second, the evidentiary proof of the conduct and communications between representatives of each defense entity, both amongst themselves and with Elmer.  This opinion will examine them each in turn.

**ORD ON MTNS**
**FOR SUMM JMT - 15**

1.      **Documented Agreements Supporting Plaintiff's Theory of Conspiracy**

     A.      **Memorandum of Understanding**

      The MOU is a multi-part document, two parts of which are at issue in this lawsuit.  There is a "Memorandum of Understanding" which describes a three-tiered system of concessions within the airport.   There is no dispute that, as described in the agreement, FEE was to be a "Tier I" concessionaire.  The other part of the MOU which is relevant to this case is Exhibit A to the Memorandum (which is labeled "Position on Labor Harmony for Concession") – specifically, the "General Statement" which has been quoted *supra* and admonishes that "failure by a concessionaire or any of its sublessees" to implement a LHP will be deemed a breach of contract.  Pltf Exh. 29, UNION002460.

      Both of the parties to the MOU argue strenuously that Exhibit A is inapplicable to Tier I concessionaires, including Plaintiff.  At the very least, the document is unclear in this regard.  In the portion of the memorandum describing Tier II concessionaires, the following language appears: "See 2., below, for provisions related to Labor and Worker Retention that will be included in the solicitation for and selection of these concessionaires."  Paragraph 2 states, in relevant part: "The Port will solicit qualifications of interested parties, and choose, the two Tier II prime concessionaires through Request for Qualifications ("RFQ"). . .  These RFQs will be governed by the Position on Labor Harmony for Concessions (Exhibit A). . ."  Id. at UNION002458-59.

      This Court finds, as a matter of law, that the MOU and specifically Exhibit A, "Position on Labor Harmony" could be applied to Tier I as well as Tier II concessionaires.  The language quoted above from Paragraphs 1 and 2 of the memorandum does not, as Defendants argue, clearly and unequivocally indicate that Exhibit A applied exclusively to Tier II concessionaires; it can only be read as indicating that Tier II concessionaires were to be included in the "labor harmony" requirements of Exhibit A which, by its own language, applied to "all vendors operating at the airport." (Emphasis

1   supplied.)  The Court notes the following factors in reaching this conclusion: the labeling of the

2   provision at issue as a "General Statement," the use of the phrase "all vendors," the language

3   admonishing against "[f]ailure by a concessionaire or any of its sublessees" and the complete absence

4   of any language indicating that the provisions contained in the "General Statement" were to be

5   restricted to Tier II concessionaires only.

6        HERE claims, as regards the MOU, the protection of the Noerr-Pennington doctrine, which

7   provides First Amendment protection to lobbying and legislative activities regardless of the party's

8   subjective goal or interest.  Eastern R.R.Presidents' Conference v. Noerr Motor Freight, Inc., 365

9   U.S. 127, 137-38 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 669-72 (1965).  That

10  protection was extended to unions in Franchise Realty Interstate Corp. v. San Francisco Local Joint

11  Executive Board of Culinary Workers, 542 F.2d 1076 (9th Cir. 1976), cert. denied, 430 U.S. 940

12  (1977).  As long as FEE is unable to produce evidence of any acts of unlawful economic coercion, the

13  union argues that their lobbying and persuasion efforts are afforded constitutional sanction.

14       In evaluating HERE's claim, the Court does not have to view the MOU in isolation.  In

15  addition to lobbying for a "labor harmony" requirement in its agreement with the Port, the union was

16  also negotiating for language in its CBA which mandated that the Tier I concessionaires (such as

17  Host) require all their sublessees whose businesses involved work "customarily performed" by the

18  union to employ union labor.   Noerr-Pennington has never been upheld as a shield to protect from

19  liability a union defendant who lobbies a governmental body to support concessionaires in a

20  requirement to unionize third-party subcontractors; especially with a court injunction already in place

21  prohibiting such activity.

22       Nor is the Court required to ignore the fact that Plaintiff has produced evidence that seven

23  other DBEs submitted the "labor harmony plans" called for in the MOU (and in the Port's lease with

24  Host) which consisted of nothing more than a single paragraph agreeing to adopt the CBA and accept

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 17**

union representation for their workers.  Pltf Exh's 95-101.  It is circumstantial evidence of exactly what Plaintiff is claiming – that the cost of receiving a renewed sublease at the airport was unionization – and if Plaintiff's claim is ultimately upheld the union's activities will be outside the shield of Noerr-Pennington.  A jury is entitled to consider whether that evidence tends to establish the existence of an agreement to achieve an unlawful purpose.

The union produces no case authority limiting the definition of "coercion" to actual strikes, boycotts or violence.  Plaintiff has produced circumstantial evidence that the union was willing to increase the pressure on the other parties in order to accomplish what it desired; e.g., statements by union officials concerning "a campaign of escalating actions" (Noble Decl. E, Nelson Dep., p. 36; Exh. 119) and "a lot more coming" (Noble Decl. J, Wise Dep., pp.15 20; Exh. 6) create genuine issues of fact regarding the existence of coercion in the union's conduct.

Furthermore, if it is ultimately found that the MOU violated the CityIce injunction, there will be no question of a need to produce evidence of "economic coercion:" the CityIce injunction (1) already prohibited the Port from doing what FEE alleges the MOU accomplished (thus making it illegal *per se*) and (2) was based on a finding by Judge Rothstein that HERE had "committed an illegal secondary boycott," not that it had engaged in "economic coercion."

HERE replies that it is not required to predict whether the results of its lobbying will be judicially upheld to invoke the protections of Noerr-Pennington.  Subscription Television, Inc. v. So.Cal. Theatre Owners Ass'n, 576 F.2d 230-233-34 (9th Cir. 1978).  Since it genuinely sought a legitimate result through governmental action, the union argues, it is shielded.   This is not a persuasive position: the union did not simply seek "work preservation" as a general concept; it specifically lobbied for the particular language of the MOU, and (as one of the other parties in the CityIce litigation) it can be held responsible if it knowingly trespassed the constraints established by the court's order in that case.  If the MOU is found to be an illegal attempt to mandate third-party

**ORD ON MTNS**
**FOR SUMM JMT - 18**

unionization as a condition of lease renewal, HERE should not be shielded from the consequences of seeking such a result.  To the extent that the defendant union seeks summary judgment as a matter of law concerning its part in the creation of the MOU, that motion is denied.

### B.   **Collective Bargaining Agreement**

The crucial provision in this document is Article 2.01 and its requirement that "no work customarily performed by employees covered by this Agreement" will be contracted out under sublease unless those employees are likewise covered by the CBA.   HERE argues that Plaintiff misreads Article 2.01: (1) it was intended to apply only to "new" Host sublessees. and (2) the union never sought to enforce it against anyone, including FEE.  The union points to the lack of proof that 2.01 was ever cited to coerce or persuade Host not to renew FEE's lease.

The union's arguments in this regard are not persuasive.  Concerning the intended objective of Article 2.01, there is nothing in the language that differentiates between "current" and "new" subleases.  Furthermore, as a renewing tenant, Plaintiff was negotiating a "new" sublease with Host. Viewing the evidence in the light most favorable to Plaintiff, the fact that all the DBEs except FEE filed labor harmony plans indicating their agreement to unionize tends to prove that all the renewing sublessees were treated as "new" tenants.  Furthermore, if the CBA is ultimately found to represent a "hot cargo" agreement in violation of § 8(e) of the NLRA[5], it will be illegal regardless of whether either party to the agreement attempted to enforce it.  *See* <u>Teamsters Local 728 (Brown Transport Corp.</u>, 140 NLRB 1436, 1437, 52 LLRM 1258 (1963).

Regarding the union's "lack of coercion" argument: if coercion had been applied (as Plaintiff contends) its effects were felt when Host informed FEE that they would have to obtain union approval for a LHP which Plaintiff seeks to prove was simply a disguised requirement of mandatory

---

[5]  A "hot cargo agreement" is an agreement between a union and a secondary (union) employer to boycott the goods or services of a primary (non-union) business; it is discussed in greater depth *infra*.

**ORD ON MTNS**
**FOR SUMM JMT - 19**

1    unionization.  As discussed in the MOU analysis *supra*, FEE has produced evidence of statements by

2    union officials suggesting repercussions would ensue if these agreements were not adopted.  A jury

3    could reasonably infer the existence of coercion from these statements.

4         The union takes the further position that the CBA is valid because they had a right to preserve

5    work for the union which had traditionally been performed by union labor, such as coffee service.  The

6    two-part test for a lawful work-preservation clause (set out in NLRB v. Int'l Longshoremens Assoc.,

7    447 U.S. 490, 504 (1980) (*a/k/a* ILA I) requires proof that (1) the object of the clause is preservation

8    of work traditionally performed by the union and (2) the contracting employer has the power to give

9    the employees the work at issue (the "right of control" test).[6]  This situation, according to HERE,

10   meets both those criteria.  Plaintiff has not disputed that, at some point in the past, retail coffee service

11   was the exclusive domain of the union – ILA I says that the focus is on the "lost work" of the union

12   and that they have a right to recapture that work.  Id. at 507-508.   The fact that no union worker ever

13   worked out of FEE's particular location is irrelevant – it is the kind of work historically performed by

14   union labor and that is what matters in a "work preservation" analysis.  Id.

15        The union has not convinced this Court, however, that their agreement satisfies the "right to

16   control" part of the ILA test.  The Supreme Court stated in that case that "if the contracting employer

17   has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective,

18   that is, to influence whoever does have such power over the work."  447 U.S. at 504-05.  Since Host

19   (the contracting employer) had no power to assign the work of FEE's employees, a jury would be free

20   to draw the inference that the intent of the "work preservation clause" was in fact to satisfy other

21   union objectives; i.e., to influence the non-union DBEs.  HERE's response to this argument is that

22

23        [6] The *ILA* cases involved a situation where a new technology – the use of stackable shipping containers –
     had obviated the need for the traditionally union-performed service of loading and unloading cargo from
24   ships.        The Supreme Court upheld the right of the union to recapture through CBAs the work lost through
     the advent of        the containers, even though container loading/unloading had never been performed by union
25   labor.

26   **ORD ON MTNS**
     **FOR SUMM JMT - 20**

1    Host's right to renew FEE's lease is sufficient to satisfy the "right of control" test.  HERE attempts to

2    analogize to the ILA situation, but the situations in fact appear to be different in one crucial respect:

3    the agreements in the ILA cases were directly with the contractors who controlled the container work,

4    while the CBA at issue here requires Host to impose the agreement on subcontracting employers who

5    had no part in negotiating the original agreement.  It is a critical distinction and goes to the heart of the

6    inquiry regarding whether the purpose of the agreement was "to satisfy union objectives elsewhere"

7    (Id. at 504), thus crossing the boundary into unlawful activity.  Plaintiff has raised sufficient questions

8    of material fact regarding the existence of a "secondary objective" underlying the CBA to permit that

9    question to go to a jury.

10          Although Defendants are not entitled to summary judgment as a matter of law on the basis of

11   either the MOU or the CBA, ultimately, as Plaintiff points out, the civil conspiracy case does not stand

12   or fall on these documents alone. Even though the agreements themselves may be found to have lawful

13   ends, if they are proved to have been used for unlawful purposes, or if Defendants engaged in other

14   activities which were themselves outside the bounds of permissible conduct in the context of labor and

15   lease negotiation, Defendants may still be found to have conspired against Plaintiff.  The Court finds,

16   as discussed below, that Plaintiff has also raised genuine disputes of material fact in regards to

17   Defendants' conduct which entitle them to survive summary judgment on their conspiracy cause of

18   action.

19   2.     **Defendants' Conduct Supporting Plaintiff's Theory of Conspiracy**

20          Plaintiff has raised disputed issues of material fact regarding whether the conduct of

21   Defendants during the time period in question evidences (1) a combination "to accomplish an unlawful

22   purpose or . . . to accomplish a lawful purpose by unlawful means and (2) "an agreement to

23   accomplish the conspiracy.  Newton, supra.

24

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 21**

1    Again, the parties are not in dispute regarding the impermissibility of forcing FEE to unionize

2    as a condition of receiving a lease renewal at the airport.  Yet communications from officials from

3    each of the defendants, viewed in the light most favorable to Plaintiff, could lead a reasonable jury to

4    conclude that this was in fact the goal of Defendants and that they had agreed amongst each other to

5    accomplish that goal.

6    The Court will not review the voluminous submissions by the parties in their entirety, but will

7    instead focus on representative pieces of evidence which suffice to create issues of material fact on the

8    key elements of Plaintiff's case which are challenged by Defendants' summary judgment motions.

9    First are the written statements by the Port's airport retail manager, Linda LaCombe ("LaCombe") to

10   her superiors and then to Elmer.  In March of 2003, LaCombe wrote an e-mail stating:

11               I met with Jean Elmer, Flying Eagle Espresso, this morning.  She was told                by
             Host that, per the new labor Agreement, she would need to become a                union
12               represented business. . . I believe this is all true according to the Labor Agreement that
             Host has currently.

13   Pltf Exh. 63.

14   Two months later, she communicated not only the Port's understanding of the CBA to Elmer,

15   but also the fact that the Port had discussed both the new lease and the labor agreement with

16   representatives of Defendant Host:

17               I have gone over the specifics of the new lease with Host and their new
             contract with H.E.R.E.  I understand that Pat Hedges and Art Spring [of
18               Host) have also taken you through the contract and its requirements.  It
             states in the Labor Agreement that any subtenant of Host must be unionized.
19               It further states that any business/subtenant operating as a non-union shop,
             under this agreement, violates the contract between Host and H.E.R.E.  Host
20               has met with their attorney and there is no negotiating on this point.

21   Pltf Exh. 66.  LaCombe closes the letter by indicating that "[t]he Port supports the contract between

22   Host and H.E.R.E."  Id.  LaCombe repeated the Port's position to Elmer almost *verbatim* in another

23   letter dated June 12, 2003, including that "Host has met with their attorney and there is no negotiating

24

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 22**

on this point.  The Port is unaware of anything illegal in the Host Lease agreement with H.E.R.E."

Pltf Exh. 59.

In fact, it would have been illegal for Host and the union to agree to force subcontractors to unionize as a condition of having their leases renewed.  Plaintiff succeeds, by virtue of this evidence, in creating a disputed material factual issue regarding the Port's participation in and support of a plan to accomplish mandatory unionization of subcontractors.  In its briefing, the Port has done its best to distance itself from LaCombe's statements and portray them as the opinion or mistaken belief of a lone employee.  But again Plaintiff produces documentary evidence which, viewed in a favorable light to FEE, suggests that this position was endorsed by her superiors.  From a May 23, 2003 LaCombe e-mail to Mr. Reis and Mr. Natarajan of the Port:

> She [Elmer] really must become a union member.  I completely understand   [Elmer]'s reluctance to do so.  However, it was made very clear by the  Commissioners that they value the fair and positive treatment of our employees      here at Sea Tac.  Currently, [Elmer] does not pay any benefits vacations, etc.       for her employees.

Pltf Exh. 70 (emphasis supplied).  Both LaCombe and her direct manager, Mr. Natarajan, testified at deposition that her communications were vetted by not only her superiors but the Port's attorneys as well.  Noble Decl. C, LaCombe Dep., pp. 36-41; Noble Decl. D, Natarajan Dep., pp. 37-39.

Regarding Defendant Host, it is likewise the finding of this Court that the evidence produced by Plaintiff is sufficient to create material issues of disputed fact regarding Host's participation in a civil conspiracy to force a third-party subcontractor to accept a CBA they did not negotiate.  It was Host's Letter of Intent to FEE which first advised Plaintiff that a LHP approved by the union was a prerequisite to obtaining a new lease at the airport (a requirement that was at least partially responsible for the delay in finalizing a lease renewal which was cited by Host in terminating negotiations with Plaintiff).  Since Host was not even a party to the MOU which established the labor harmony requirement, this alone is evidence from which a jury could conclude there had been a meeting of the

**ORD ON MTNS**
**FOR SUMM JMT - 23**

1    minds between these defendants as to the necessity of Plaintiff adopting the CBA between Host and

2    HERE.

3         Additionally, there is evidence that representatives of both of the other defendants had been

4    told that Host supported mandatory unionization for subcontractors.  LaCombe's correspondence on

5    behalf of the Port has been thoroughly discussed *supra*.  Plaintiff also produced evidence that

6    representations had been made to the union by Host that they would work toward the unionization of

7    the DBEs.[7]  Plaintiff has satisfied its burden of raising disputed issues of material fact regarding proof

8    of the elements of a civil conspiracy involving Defendant Host.

9         Finally, the union contests FEE's proof of a "conspiracy" between HERE, Host and the Port.

10   Their argument concerning the CBA has already been analyzed *supra*.  As discussed above, the Court

11   will not declare Article 2.01 of the CBA a legally-protected "work preservation clause" as a matter of

12   law.  FEE has produced sufficient facts to permit the issue of whether 2.01 was understood by the

13   defendants to require subcontractor unionization to go to a jury.

14        HERE  also maintains that no evidence supports Plaintiff's contention that the MOU was part

15   of some larger conspiracy between these three entities and that Plaintiff has submitted no evidence of

16   other communications between all the defendants (much less any agreements between them)

17   concerning FEE's attempts to renew its lease.   But it has already been established as a matter of law

18   that Exhibit A of the MOU (with its mandatory LHP requirement) could be applied to Tier I

19   concessionaires such as Plaintiff; indeed, it is apparent that Defendant Host did apply such a

20   requirement, as reflected in its communications to FEE through the LOI.[8]

21   _____

22        [7] From contemporaneous notes taken by a union official during negotiations between Host and HERE,
     union official Sawyer is quoted as saying "Art [Spring, of Host] made commitment that attorneys would
     work together to develop language that would bind all HMS and DBEs to be unionized."  Noble Decl. E,
23p 36,        Pltf Exh. 119.

24        [8] The August 27, 2003 LOI from Host to FEE stated:
              Host is prepared to offer you the opportunity to continue operation of a coffee concession. . .

25            subject to the execution of a new sublease agreement for your location, which sublease will

26   **ORD ON MTNS**
     **FOR SUMM JMT - 24**

1   The union argues that, even if a LHP was a prerequisite to lease renewal, it was not

2   synonymous with "mandatory unionization" and that the elements of the plan, listed at the end of

3   Exhibit A, support this position.  This argument is greatly weakened, however, by apparent

4   contradiction represented by union president Sawyer (who signed the MOU containing the LHP

5   requirement) telling Elmer that he was unaware of any LHP requirement (Elmer Decl. ¶ 13) and didn't

6   consider it "appropriate" to discuss with her.  Noble Decl. F, Sawyer Dep. p. 129.  Although Elmer

7   reported immediately after this meeting that she now believed there was no unionization requirement

8   (Decl. of Natarajan, ¶ 14, Exh. F), she later came to believe that in fact Sawyer had been deceptive in

9   his responses to her.   The Court does not weigh evidence at this stage of the proceedings, but it is

10  appropriate to determine if Plaintiff has established a genuine issue for trial, and the inconsistency

11  between Sawyer's participation in the drafting of the MOU and his representations to Elmer could lead

12  a jury to infer the existence of an agreement to freeze FEE out of the re-leasing process based on

13  Plaintiff's resistance to unionizing.

14   Proof of a conspiracy will rarely be achieved through direct evidence, and Plaintiff is entitled to

15  establish its case circumstantially.  Gilbrook v. Westminster, 177 F.3d 839, 856-57 (9th Cir. 1999).

16  The circumstances established by Plaintiff's evidence are that HERE and the Port entered into a MOU

17  which required the submission of LHPs by the sublessees of any concessionaire at the facility; that

18  Host and HERE entered into a CBA which required Host to sublease out work "customarily

19  performed" by union labor only to employers covered by the agreement; and that Host then told

20  Plaintiff it would not receive a new lease unless it submitted a union-approved LHP.

21   The point is not that Plaintiff has produced enough evidence to win a summary judgment

22  motion of its own or to prevail at trial.  FEE's burden in responding to these summary judgment

23  ─────────────────

24       include the following terms and conditions:
         ***

25       •     A Labor Harmony Plan. . . . Your Labor Harmony Plan is to contain a statement as to
               whether HERE Local 8 is in agreement with your plan.  Pltf Exh. 42, HOST0000138.

26  **ORD ON MTNS**
    **FOR SUMM JMT - 25**

1   motions is to produce evidence sufficient to raise a genuine dispute of material fact.  A jury hearing

2   this evidence (and the evidence of the other statements by representatives of defendants regarding

3   mandatory unionization) could reasonably infer that there had been a meeting of the minds between all

4   three Defendants that all sublessees would have to agree to join the union and that the vehicle for

5   accomplishing that agreement would be the LHP.  The Court must view the evidence produced in the

6   light most favorable to Plaintiff, and the evidence produced suffices to create disputed material issues

7   of proof on the civil conspiracy cause of action.  On that basis, summary judgment must be DENIED.

8          The Court also DENIES summary judgment as to:

9   **Unfair Labor Practices (Third Cause of Action)**

10         This cause of action is directed only against the union and alleges violations of two sections of

11  the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158 *et seq.*: § 8(b)(4)(B), which bars unions

12  from "forcing or requiring any person . . . to cease doing business with any other person; and § 8(e),

13  which defines as an unfair labor practice "any contract or agreement, express or implied" between a

14  union and an employer "to cease doing business with any other person."  Both of these provisions are

15  aimed at the practice of "secondary boycotts," whereby a union can apply pressure on one (non-union)

16  employer through the union's relationship with another (union) employer.  Violations of 8(b)(4) cover

17  a wide range of actions but require some proof of coercion (Shepard v. NLRB, 459 U.S. 344, 351

18  (1983)), while 8(e) is aimed at "hot cargo agreements" wherein a union and employer enter into an

19  agreement that the employer will not do business with a second employer whom the union considers to

20  be unfair to organized labor.  Betal Environmental Corp. v. Local Union No. 78, 123 F.Supp.2d 156,

21  158, fn. 2 (S.D.N.Y. 2000) (citations omitted).

22         The union's arguments regarding "work preservation clauses" and the Noerr-Pennington

23  doctrine appear to be addressed to both its alleged participation in the conspiracy to violate Plaintiff's

24  federal rights and its alleged violations of the NLRA.  The Court's analysis of those arguments *supra*

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 26**

1   will not be repeated here, but that analysis requires denial of the union's summary judgment motion as

2   it applies to the 8(b)(4) and 8(e) claims as well.

3          The union makes the additional argument, aimed at FEE's 8(b)(4) claim, that there is no

4   evidence of "coercion" to sustain that violation.  But the term "coerce" extends to "any form of

5   economic pressure of a compelling or restraining nature" (Association of General Contractors of

6   Calif., Inc. v. NLRB, 514 F.2d 433, 438-39 (9th Cir. 1975)) and the MOU contains unmistakable

7   language that "[f]ailure by a concessionaire or any of its sublessees" to implement a LHP "will be

8   deemed a breach of the Contract, which will subject the Concessionaire to termination of the Contract

9   with the Port."  Pltf Exh. 29, UNION 002460.  A jury could reasonably infer, from this and other

10  evidence produced by FEE, that this constituted "economic pressure of a compelling. . . nature."

11  Further, statements by union officials regarding a "campaign of escalating actions" and "a lot more

12  coming" also combine to create a genuine issue for trial regarding the existence of "coercion" in the

13  union's statements and actions.

14         The union's request for summary judgment of dismissal of the claims of NLRA violations will

15  be denied.

16         Summary judgment will likewise be DENIED regarding:

17  **Tortious Interference With Business Expectancy (Eighth Cause of Action)**

18         Plaintiff alleges this cause of action against the Port and HERE.  There are five elements to

19  establishing this cause of action: (1) a valid contract or business expectancy; (2) of which the Port and

20  HERE had knowledge; (3) an intentional interference inducing or causing a breach of the contract or

21  expectancy; (4) existence of an improper motive or use of an improper means in the interference; (5)

22  resulting in damages.  Leingang v. Pierce Co. Med Bureau, Inc., 131 Wn.2d 133, 157 (1997).

23         Plaintiff has brought forward evidence sufficient to create genuine disputes of material fact on

24  all of these elements and is entitled to go forward with this claim.  "A valid business expectancy

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 27**

1   includes any prospective contractual or business relationship that would be of pecuniary value."

2   Newton Insurance Agency & Brokerage, Inc. v. Caledonian Insurance Group, Inc., 115 Wn.App. 151,

3   158 (2002).  Certainly FEE's negotiations with Host regarding renewal of its lease constituted a

4   "prospective contractual or business relationship," and neither the Port nor HERE have disputed that

5   they were aware that the negotiations were taking place and that Plaintiff was seeking a new lease to

6   continue its business at the airport.

7        The existence of "intentional interference inducing or causing a breach of . . . the expectancy"

8   arising out of "an improper motive or use of an improper means" parallels Plaintiff's allegations

9   regarding the existence of a conspiracy.  The analysis of Defendants' motions for summary judgment

10  on the conspiracy cause of action also suffices regarding their request for dismissal of this claim.

11  Sufficient evidence has been adduced to create genuine issues of material fact regarding whether the

12  Port and HERE interfered for an improper motive or using improper means with FEE's business

13  expectancy in a new airport lease.  Neither of those defendants has challenged the adequacy of

14  Plaintiff's pleading of damages arising out of these facts.

15       The motion for summary judgment on Plaintiff's eighth cause of action will be DENIED.

16       Finally, the Court DENIES summary judgment on:

17  **42 U.S.C. § 1983/Violation of Plaintiff's Federally Protected NLRA Rights (Ninth Cause of**

18  **Action)**

19       All Defendants have sought dismissal of this cause of action, which was added by amendment

20  rather late in the case.  For reasons largely explored under the analysis of the summary judgment

21  motions on the civil conspiracy claim, this portion of the motion will be denied as to all Defendants as

22  well.

23               The elements of a §1983 claim are: (1) that the conduct complained of
             was committed by a person acting under color of state law; and (2) that
24           the conduct deprived a person of rights, privileges, or immunities secured            by
             the Constitution or laws of the United States.

25

26  **ORD ON MTNS**
   **FOR SUMM JMT - 28**

1    Johnson v. Hawe, 388 F.3d 676, 681 (9th Cir. 2004 (quoting Alford v. Haner, 333 F.3d 972, 975-76

2    (9th Cir. 2003).  The "state actor" component can be established by showing that a private person

3    conspired with a local governmental official.  *See, e.g.*, Adickes v. Kress & Co., 398 U.S. 144 (1970).

4          The Port satisfies the "state actor" requirement by virtue of being a municipal governmental

5    entity.  For the same reasons that neither of the private defendants are entitled to summary judgment

6    on Plaintiff's civil conspiracy cause of action, the Court finds that Plaintiff has sufficiently established

7    disputed issues of material fact regarding whether Host and HERE conspired with the Port to satisfy

8    this element of its § 1983 claim for summary judgment purposes.   "A defendant's knowledge of and

9    participation in a conspiracy may be inferred from circumstantial evidence from evidence of the

10   defendant's actions."  Gilbrook v. City of Westminster, 177 F.3d 839, 856-57 (9th Cir. 1999).

11         Regarding the deprivation of "rights. . . secured by the Constitution or laws of the United

12   States" required for proof of the second element of § 1983, the Court finds that, as regards Plaintiff,

13   those rights are represented by the protections afforded under the NLRA. Plaintiff has a right to

14   operate free from "hot cargo" agreements and any other activities or conspiracies aimed at

15   conditioning its continued operation on involuntary unionization, and, under certain circumstances

16   (which have been found here), § 1983 represents a bulwark against that kind of activity.

17         Defendants reiterate many of their previous arguments regarding the legality of the MOU and

18   the CBA and the lack of other circumstantial evidence demonstrating their intent to trespass on FEE's

19   federally-protected rights under the NLRA.  The analysis of those arguments will not be repeated here;

20   for the same reasons this Court found that Plaintiff has established the existence of genuine issues for

21   trial on the allegations of civil conspiracy to violate its rights, Plaintiff has also shown that disputed

22   issues of material fact remain concerning its allegations of § 1983 violations. Even if the documents at

23   the heart of this case are ultimately found to either not apply to Plaintiff or not to contain explicit or

24   implicit unionization requirements for airport sublessees, there remains sufficient evidence of oral and

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 29**

1   written statements by representatives of all defendants to create genuine factual disputes regarding

2   whether these Defendants supported the forced, illegal unionization of this Plaintiff.

3         The union, however, does approach its summary judgment request on this claim from a

4   different angle.  To the extent that the §1983 claim is premised on the illegality of the CBA between

5   Host and the union, HERE argues the NLRA preempts use of any other remedy, except in very limited

6   circumstances which HERE alleges are not present.  HERE claims that Plaintiff's claims regarding the

7   CBA are premised exclusively on § 8(e) of the NLRA (HERE's §1983 Motion, p. 7) and cites case

8   law that 8(e) allegations are outside a federal court's Taft-Hartley Act jurisdiction.  <u>Atchison, Topeka</u>

9   <u>& Santa Fe RR v. Teamsters Local 70</u>, 511 F.2d 1193, 1195 (9th Cir. 1975).  Thus, the argument

10  concludes, the sole remedy is a claim with the National Labor Relations Board ("NLRB").

11        The union does not entirely ignore the fact that Plaintiff has also alleged § 8(b)(4) violations

12  against them (which is one of the exceptions to exclusive NLRA jurisdiction), but tries to argue that

13  the fact that Plaintiff was not a party to the CBA means they cannot assert an 8(b)(4) violation as

14  regards that agreement.  It is not a compelling argument – the case they cite in support of it (<u>Betal</u>

15  <u>Environmental Corp. v. Local No. 78</u>, 123 F.Supp.2d 156 (S.D.N.Y. 2000)) was also dependent on a

16  finding that the Plaintiff there had presented no evidence that it had been forced or required to

17  unionize.  That is hardly the case here – as pointed out previously, there are many areas of disputed

18  material fact regarding the issue of mandatory unionization

19        The union claims further preemption in the form of the exclusivity of §303 of the Labor

20  Management Relations (Taft-Hartley) Act, 29 U.S.C. § 187.  They cite <u>Teamsters v. Morton</u>, 377

21  U.S. 252, 258-60 (1964) for the holding that the congressional intent behind §303 bars any non-

22  NLRA remedies.  They argue by analogy that the case law which prohibits punitive damages,

23  attorneys' fees (<u>Summit Valley Industries v. Carpenters Local 112</u>, 456 U.S. 717, 723-34 (1982)) and

24

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 30**

1   §1985 violations (<u>Amoco Oil Co. v. Electrical Workers Local 99</u>, 5365 F.Supp. 1203, 1217-19

2   (D.R.I. 1982)) also acts to bar relief under §1983.

3          The Court finds none of the union's "exclusivity" arguments persuasive.  Plaintiff's claims

4   against them are premised on violations of 8(b)(4) as well as 8(e) and as such are exempt from the

5   exclusive jurisdiction of the NLRB.  Congress gave parties with allegations of 8(b)(4) violations the

6   right to sue a union for damages "in any district court of the United States."  29 U.S.C. § 187(b).

7   Plaintiff cites Supreme Court case law which holds that the NLRA does not preclude a §1983 action

8   arising from government interference with federally-protected labor rights.  <u>Golden State Transit</u>

9   <u>Corp. v. City of Los Angeles</u>, 493 U.S. 103, 108-09 (1989).  Further, private parties may be liable

10  under §1983 when they join with government entities to interfere with federally-protected rights.

11  <u>Dennis v. Sparks</u>, 449 U.S. 24, 27-29 (1980).

12         <u>Golden State</u>, *supra,* also holds that the burden is on the union to establish that §1983

13  protection has been withdrawn for violation of a particular federal right.  493 U.S. at 107.  None of

14  the union's cases involve a holding that §303 is the exclusive remedy which pre-empts §1983 in cases

15  where 8(b)(4) violations are alleged.  A recent District Court opinion from this circuit states:

16             [S]ection 303 has scant legislative history.  The little historical guidance         that
               does exist fails to indicate any Congressional intent that sections         8(b)(4)
17             and 303 be the exclusive remedy for persons injured by         secondary labor
               activities.

18
19  <u>Sutter Health v. UNITE HERE</u>, ___ F.Supp.2d ___, 2005 WL 1925910, *5 (E.D.Cal. Aug. 10,

20  2005).

21         It is the finding of this Court that Plaintiff has established sufficient disputed facts regarding

22  violations of its rights under § 1983 to withstand summary judgment on that cause of action.  None of

23  Defendants' arguments that they are entitled to summary judgment as a matter of law has succeeded in

24  persuading the Court that a jury should not hear and decide this matter.

25

26  **ORD ON MTNS**
    **FOR SUMM JMT - 31**

1    As regards Plaintiff's final cause of action:

2    **Contempt of Court (Tenth Cause of Action)**

3    This allegation is made against the Port only and concerns Plaintiff's assertion that the Port's

4    activities in the circumstances at issue in this case violate the terms of the injunction issued by Judge

5    Rothstein in <u>CityIce</u>, *supra*.  The Order and Consent which contain the injunction state:

6    > <u>Court's Continuing Jurisdiction to Adjudicate Any Disputes Regarding This</u>
     > <u>Consent Judgment.</u>  The Court hereby RETAINS JURISDICTION over the
7    > parties for the purposes of deciding any disputes or issues regarding the    interpretation
     > or application of, or compliance with, this Consent Judgment.         Any such disputes
8    > or issues must be adjudicated in this Court, and only in          this Court.  Consent
     > and Order, p. 5.

9    Defendant's motion for summary judgment on this claim will be DENIED at this stage of the

10   proceeding to permit a referral of this claim to Judge Rothstein to permit her to determine whether she

11   wishes to retain jurisdiction over this particular dispute concerning the application of the injunction.

12   **Conclusion**

13   Summary judgment will be GRANTED on Plaintiff's claims of violations of the Washington

14   anti-trust laws and Consumer Protection Act.  Summary judgment will be DENIED as to the

15   following causes of action, which remain active in the case:

16   • Civil conspiracy under Washington state law (as to all Defendants)

17   • Violations of 42 U.S.C. § 1983 (as to all Defendants)

18   • Violations of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4) and (e) (as to

19   Defendant HERE only)

20   • Allegations of tortious interference with a business expectancy (as to Defendants the

21   Port of Seattle and HERE only).

22   Plaintiff's cause of action for contempt against the Port will be referred to Judge Barbara J.

23   Rothstein for a determination of whether she wishes to retain jurisdiction over this particular

24   application of her previous order.

25

26   **ORD ON MTNS**
     **FOR SUMM JMT - 32**

1

2          The clerk is directed to provide copies of this order to all counsel of record.

3          Dated: September 21, 2005

4

5                                                 Marsha J. Pechman
                                                  U.S. District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    **ORD ON MTNS**
      **FOR SUMM JMT - 33**